Exhibit A

Excerpt from Council Report

# Council of the District of Columbia
# Committee on Consumer and Regulatory Affairs
## Report on FY 2003 Budget Request of 2002
## 1350 Pennsylvania Avenue, N.W., Washington, D.C. 20004

The Committee on Consumer and Regulatory Affairs ("Committee") presents its report and recommendations on the Mayor's proposed Budget for Fiscal Year ("FY") 2003, for the budgets of the agencies under the Committee, and recommends Committee of the Whole ("COW") approval of the report.

The Committee exercises oversight of District agencies responsible for the comprehensive regulation of businesses to ensure the protection of the public's health and safety, land and building uses, occupations and professions, rental housing, condominiums, public utilities, banking and financial institutions, and insurance and securities regulation. These agencies include the newly formed Alcoholic Beverage Regulatory Agency ("ABRA")[1], the Department of Consumer and Regulatory Affairs ("DCRA"), the D.C. Public Service Commission ("PSC"), the Office of People's Counsel ("OPC"), the Department of Banking and Financial Institutions ("DBFI"), and the Department of Insurance and Securities Regulation ("DISR").

Also, while not a line item in the District's budget, the Committee also exercises oversight over the District of Columbia Housing Authority ("DCHA" or "Housing Authority"), which had been under a court-ordered receivership for 5 years that came to an end during Council period 13. Based on enabling legislation passed by the Council at the end of calendar year 2000, the DCHA is a newly constituted Housing Authority that has a new Executive Director and is governed by a newly formed Board of Commissioners who took office during FY 2001.

The Committee on Consumer and Regulatory Affairs held a total of 3 hearings on the FY2003 Budget Request, including the FY 2003 to FY 2008 Capital Spending Plan and the FY2003 Budget Support Act, as well as the Spending Plan for FY 2002 and oversight of the performance of the agencies under its jurisdiction.

---

[1] The Committee became responsible for oversight and budget for ABRA when the law that enacted Title 25 of the D.C. Code and which formed this new regulatory agency and revised the District's Alcoholic Beverage Control law went into effect at the end of FY 2002.

consultants to address land, soil, and water problems to avoid making residents have to pay for these services.

Councilmember Catania stated that he did not believe that the parcel at 55th and Clay Streets is sustainable for construction because the land is not fit. He further voiced concern about how anyone who would be offered these homes built on this land would be able to afford the potential economic loss and hardship that would likely occur as a result from purchasing a building constructed on unsuitable land.

Councilmember Fenty indicated that Ms. Whitlock had requested him to consider legislation on this matter when it came before the Council, and he agreed that he would do so.

Councilmember Graham made a statement, indicating that although he is no longer a member of this Committee, he wanted to attend the hearing. He stated that he appreciates the Director's attentiveness to issues in the Councilmember's ward. He commended Mr. Clark's responsiveness. He stated that there remain frustrating problems with respect to nuisance properties. The Councilmember outlined some specific addresses where violations exist.

**Betty Sellers and David Conn, Tenant Action Network** - Mr. Conn and Ms. Sellers presented detailed testimony about the rental housing program. They volunteer with TAN, an organization that represents the interests of renters in the District. They pointed out that about 65% of District residents rent their homes.

Mr. Conn and Ms. Sellers summarized specific problems with DCRA, HRA, and OAD, and provided suggested remedies. First, they complained that the agency is not sufficiently responsive to tenants or other consumer groups, despite the term "consumer" in the name of the agency. They specifically stated their concern at not receiving follow up responses from the DCRA Director.

They indicated that the HRA had suffered a setback in doing its job well when it changed administrators a few years back. When Ms. Lewis was the HRA Administrator, she had a policy in place whereby tenants who had a rental housing complaint could obtain housing inspection reports when the landlord did. Now, they are told they must file Freedom of Information Act (FOIA) requests. Even when complainants try to comply with this directive, DCRA staff are uncooperative in assisting complainants in filing these FOIA requests or in responding to them, as required by law.

They pointed out the wastefulness of having each inspector in the Housing Inspection Division work on an individual computer without search capability to find out all the inspections having been or being conducted at a particular building and the resultant housing code violations, especially multi-family buildings.[15]

---

---

[15] The Committee concurs that if this inability to access full reports is the case, inspectors (and their supervisors) need to have access to more complete search capability. If using the RAPIDS system actually provides this information, then the issue is one of properly managing the information and having a policy in place whereby inspectors are required to search for and review past housing code violations in a building. **The Committee expects DCRA to determine what is the case and rectify the matter. The Committee directs the agency to come back to the Committee within 100 days of the markup and provide a report of its analysis and describe the solutions it will put into effect (and when).**

Mr. Conn and Ms. Sellers questioned when the Mayor would be appointing a new Rent Administrator, since the prior incumbent in that position left the agency in February.[16] They complained that tenant groups had not been consulted on this selection process. They outlined the duties of the Rent Administrator and requested not to have that person's power delegated to OAD but to provide the new Rent Administrator with sufficient staff, although they acknowledged that the current practice of delegation has been occurring for 15 years. They suggested that HRA's authority is weakened in the absence of a knowledgeable Rent Administrator and the delegation of authority over the hearing examiners to OAD's chief ALJ. They noted that there has been a serious deterioration in the quality of hearing examiner decisions since OAD has taken over this delegation. Nonetheless, they acknowledged that the delegation had been upheld by the RHC in a 2 to 1 decision.

Mr. Conn and Ms. Sellers emphasized that the rental housing component has had major weaknesses for the last 15 years and that if DCRA (particularly its Director and the HRA Administrator, Mr. James Aldridge) does not work with tenant organizations, it will fail. They also criticized the operations of OAD with respect to that office's handling of rental housing cases. OAD often has lost records of administrative proceedings. They support this allegation by noting that a review of RHC decisions over the last 5 years indicates that about 30% of the OAD decisions have to be remanded for a *de novo* hearings because the OAD has lost or misplaced the record.[17]

While Mr. Conn and Ms. Sellers hoped that OAD's record would improve under the Director's leadership, they described situations in which OAD had failed miserably. They noted instances in which a hearing examiner on contract quit in the middle of a case before he had written the recommended decisions on the contested case he had heard. When this occurred, a new hearing examiner had to rehear the testimony to assess credibility, creating a further unanticipated backlog. They also noted that the audio taping equipment at DCRA, while improved, does not always work properly.[18]

---

[16] This issue also greatly concerned the Committee. The Director brought the new Rent Administrator to the Committee's third budget hearing on April 10, 2002, at the start of her new job.

[17] The Committee agrees that, if this is the case, it is totally unacceptable. The **Committee directs DCRA, within the next 90 days, to completely inventory the rental housing cases in OAD, particularly those in the backlog, and to review the records for completeness and report back to the Committee on its findings. Where there is an incomplete record, notice must be provided to the parties to allow them to appropriately remedy the situation -- where appropriate, this may involve a new hearing but in other instances (as Mr. Conn outlined in Mr. Hagan's case) it might only involve hearing a few issues on remand, so as to preserve their rights. Once this review is completed, the Committee directs the agency to provide the Committee with a report on its findings.**

They asked for OAD hearing decisions to be placed on DCRA's web page, since the technology exists and the state of Maryland has the ability to get its rental opinions on line. They provided several recommendations for improvements to DCRA's web site in the housing area, including adding practical information and instructions on how to fill out forms and obtain documents.[19]

Mr. Conn and Ms. Sellers indicated that OAD should be considered a failure based on its poor procedural handling of matters before it alone without taking into account "the sub-standard writing, legal analysis, factual analysis, and results reached in decisions." They question why hearing examiners are not better trained and why the Administration cannot properly delegate to ALJs the role of hearing rental housing cases. In addition, they suggested that the agency hire a tenant advocate to assist *pro se* complainant-tenants in contested cases to avoid the large number of procedural errors. At the back of their written testimony are a number of suggestions and recommendations to improve matters at DCRA with regard to rental housing.

Chairperson Ambrose thanked the witnesses for all their hard work in this area and noted that she had read through your concerns with the rental housing act and the suggestions that you have put forth. She stated that even though the rental housing law had been extended until 2005, we still need to fully review the procedures under the law for areas to improve the process.

**Shaun Pharr, Apartment Owners and Builders Association (AOBA)** - Mr. Pharr testified that DCRA deals with more issues of significance to AOBA than any other department in the city. All business regulation and licensure, building code housing code, rental housing law, and professional licensure matters are overseen by DCRA and impact AOBA's members directly and significantly. AOBA expressed general support for DCRA's FY 2003 budget request.

Mr. Pharr noted AOBA's appreciation for the Committee's efforts to address concerns about nuisance properties and emphasized AOBA's support for strong enforcement against nuisance properties. He shared that AOBA co-sponsored a seminar with DCRA last summer on the 3rd party review program when the program was due to be implemented. Unfortunately, full implementation has not occurred. Mr. Pharr alluded to passage of Bill 14-184, the HomeStart Regulatory Improvement Act, and suggested that the Committee seek assurances that the Williams administration be prepared to swiftly implement that bill once it becomes law. He also mentioned that Bill 14-307, the Urban Forest Preservation Act of 2001, will significantly disrupt the building permit process in DCRA. He urged the Committee to examine the legislation and its implications for DCRA prior to its mark up by the Committee on Public Works.

---

[18] **The Committee directs the agency, particularly Mission Support, to look into this problem and see if there is not a solution.**

[19] **The Committee thinks this is an excellent suggestion and directs the agency to develop a plan to make it a reality.**

51